UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CATHERINE LUNDY,

                          Plaintiff,

                                                    <u>DECISION AND ORDER</u>

                                                    06-CV-6280L

              v.

TOWN OF BRIGHTON,
THOMAS VOELKL,
Chief of Police, in his Individual and Official Capacities,

                          Defendants.

_____

       Plaintiff Catherine Lundy, a former officer in the Town of Brighton (N.Y.) Police

Department, brings this action against the Town of Brighton ("Town") and Brighton Chief of Police

Thomas Voelkl.  Plaintiff Lundy, a former Town of Brighton police officer, asserts a variety of

claims arising out of a dispute over disability leave that she took as a result of an on-the-job injury

in 2003.

       On November 9, 2007, the Court issued a Decision and Order in this case, 521 F.Supp.2d

259, familiarity with which is assumed, in which I granted defendants' motion to dismiss several of

plaintiff's claims.  As a result, there are currently three claims remaining in this action:  a claim

against the Town, alleging unlawful retaliation in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e; a claim against both defendants alleging unlawful retaliation in violation

of the New York State Human Rights Law ("HRL"),  N.Y. Exec. Law § § 290 et seq.; and a claim

against the Town under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.[1]

Defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules

of Civil Procedure, dismissing plaintiff's remaining claims.  For the reasons that follow, defendants'

motion is granted in part and denied in part.


# BACKGROUND

Plaintiff began her employment as a Brighton police officer in 1982, eventually rising to the

rank of sergeant.  In the summer of 2002, plaintiff injured her shoulder on the job, when an

apparently mentally unstable individual accosted her outside the Brighton Town Hall.  Although

plaintiff received medical treatment for that injury, she did not take any disability leave at that time.

In March 2003, Voelkl sent a letter to the president of the Brighton police union informing

him of certain changes regarding the accrual of vacation time and similar benefits during a period

in which an officer is on leave under § 207-c of the New York General Municipal Law.  That statute

provides, in part, that

> [a]ny ... member of a police force of any ... town or village ... who is injured in the
> performance of his duties ... so as to necessitate medical or other lawful remedial treatment
> shall be paid by the municipality ... by which he is employed the full amount of his regular
> salary or wages from such employer until his disability arising therefrom has ceased, and, in
> addition such municipality ... shall be liable for all medical treatment and hospital care
> necessitated by reason of such injury or illness.

---

[1]Although defendants' motion papers also address two other claims against Voelkl under
42 U.S.C. § 1983, for unlawful retaliation in violation of the First Amendment, and for unlawful
sex discrimination, it appears from plaintiff's papers, *see* Plaintiff's Mem. of Law (Dkt. #37-9) at
2 and from the statements of her attorney at oral argument that she has withdrawn or abandoned
those claims, and they are therefore dismissed.

In his letter, Voelkl noted that Officer Thomas E. Sleep, who had been on § 207-c leave since August 2002 due to injuries received in a duty-related motor vehicle accident, had recently given notice of his intent to retire effective March 28, 2003. Def. Ex. F (Dkt. #28-7) at 2. Voelkl stated that there was initially some uncertainty about how to calculate Sleep's benefits, because § 207-c does not explicitly address the accrual of benefits during a period of leave, nor was there any precedent within the Brighton Police Department for such a situation.

Voelkl stated that he had "requested legal guidance" on the matter, and that it had been determined that Sleep was not entitled to additional leave accruals or other fringe benefits during his § 207-c leave. Nevertheless, he added, "the decision has been made to include the benefits accrued during Officer Sleep's 207-c leave. This action will apply only to Officer Sleep's unique situation and does not establish a past practice with respect to future determinations. I am therefore placing you on notice that from this point forward, it will be the policy of the Town of Brighton and the Brighton Police Department to suspend the accrual of fringe benefits during periods of 207-c leave ... ." *Id.* at 2-3.

In June 2003, plaintiff had surgery on her shoulder to repair a muscle tear that she had suffered in the Summer 2002 incident. Following that surgery, plaintiff went on disability leave under § 207-c.

In March 2004, plaintiff returned to "light duty" work, consistent with the restrictions recommended by her physicians. She testified that the assignment she was given involved sitting at a desk for long periods, and that this bothered her neck and shoulder. Plaintiff's Deposition Transcript ("Tr."), Def. Ex. C (Dkt. #28-4) at 190; Lundy Decl. (Dkt. #37) ¶ 36.

Plaintiff brought this up with Voelkl, and in May 2004, she was transferred to the records department. Tr. at 195. Apparently this did not bother her physically, but she objected to having to wear a uniform in that assignment. Plaintiff was not allowed to wear her firearm, and she testified that she did not want to be "exposed to the public and in uniform and unable to defend [her]self" if a violent situation arose. Tr. at 199.

In the meantime, plaintiff had discovered, around the end of 2003, that she had not been accruing any sick leave or vacation leave while she was on § 207-c leave. In August 2004, plaintiff filed a complaint with the New York State Division of Human Rights ("SDHR"), alleging that unlike Officer Sleep, she had not received or accrued her full benefits while on leave, and that this disparate treatment was an "indirect [sic] result of [her] gender ... ." Def. Ex. D (Dkt. #28-5) at 3 ¶ 6. The SDHR complaint was ultimately dismissed as untimely on August 11, 2005, because it was filed over a year after Voelkl implemented the new policy concerning 207-c leave, and fourteen months after plaintiff went on leave.

Plaintiff alleges that around the same time that she filed her SDHR complaint, Voelkl summoned her to his office, and informed her that she was going to be sent to an elementary school in Brighton to teach Drug Abuse Resistance Education, commonly known as "D.A.R.E." Plaintiff told Voelkl that she did not want to teach D.A.R.E., because she was concerned for her safety, "roaming the [school] halls in uniform with no gun ... ."[2] Tr. at 211. Voelkl was initially insistent that plaintiff carry out the D.A.R.E. assignment, but on or about September 10, 2004, he informed her that she would not be going to D.A.R.E. after all. Instead, Voelkl stated, plaintiff would be

---

[2]Plaintiff explained that there had been "an incident when a father came and kidnapped a child" at the school, adding, "I'm not afraid of the children." Tr. at 211.

attending Instructor Development School ("IDS") beginning September 14. IDS was a program that trained officers so that they could qualify to instruct other officers in various subject areas.

At her deposition, plaintiff testified that among some officers, IDS training is "sought after," because it is looked upon as something that might help advance their careers. Def. Ex. C at 228. Plaintiff, however, did not want to attend IDS, for personal reasons. She testified that she told Voelkl that she "d[id]n't think [she was] equipped to do this [IDS] right now" because she was "under a lot of stress" and had "doctor's appointments coming up ... ." Tr. at 231-32. Voelkl allegedly responded, in sum and substance, that "it was just the way it was going to be," and that plaintiff had no other choice but to attend IDS. Tr. at 233.

On September 14, 2004, plaintiff showed up for her first day of IDS. She became very upset, however, and during the lunch break, she went to the police department building to speak to one of her superiors, Captain Principe. After speaking with plaintiff, Principe told her she should go home and take the rest of the day off, which she did.

Plaintiff testified that Voelkl called her later that day at her home, and asked her why she was not at IDS. She replied that she "was having some emotional difficulties," and Voelkl allegedly told her to "[r]eport to work for the rest of [her] shift" that day. Tr. at 239. Plaintiff testified that she responded, "I can't come in. I need to take some sick time," to which he replied, "You can't take sick time." Plaintiff asked if she could "take comp time," and Voelkl said, "I suppose so," adding, "But I expect you to be at training tomorrow." When plaintiff responded that she had an appointment with a psychiatrist the next day, Voelkl allegedly stated, "Then I want a written excuse that precludes you from going to training." *Id.*

Plaintiff did not go back into work that day, and she took the following two days off as well. She testified that she took "[e]ither comp or holiday" time for the rest of that afternoon. The following day, plaintiff took sick time for her psychiatric appointment, and, because she did not have enough comp time left, either vacation or holiday time for the balance of the day. The day after that, plaintiff had a medical appointment, and again she took a half day of sick time and a half day of vacation or holiday time. Tr. at 241-42.

Plaintiff then returned to work, and apparently she did not go back to IDS. She continued to perform light-duty work, such as transcribing wiretap recordings.

Plaintiff alleges that around this time, her "work hours started to change constantly with no prior conversation or notice." Amended Complaint ¶ 58. Plaintiff testified that this was particularly difficult for her because she had a child, and she had recently gotten married. She stated that "[w]hen [she] would ask [Voelkl], "Can you give me at least a month or two that I know I'm going to be working?' he said, 'I will change your hours at my whim for whatever meets the needs of the department[.]'" Tr. at 209.

Plaintiff testified that these work hour changes occurred "[e]very couple of months." Tr. at 258. The changes involved switching from one eight-hour shift to another, so that "[o]ne week [she] would be working until ten o'clock at night and the next week [she] would be working from eight to four. The next week [she] would be working two to ten. The next week noon to eight," and so on. *Id.*[3]

---

[3]It is not clear why plaintiff stated that her schedule changed "every couple of months," but that her shifts would change from one week to the next.

In October 2004, plaintiff reinjured her shoulder while on duty. She immediately went and informed Voelkl what had happened. He called in Captain Cavallaro, and according to plaintiff, Voelkl said to Cavallaro, "She's alleging she hurt her shoulder again." Amended Complaint ¶ 59; Tr. at 263. Cavallaro, who was present when plaintiff reinjured her shoulder, allegedly replied, "No. She's not alleging. I saw it and that's what happened." Tr. at 263. Cavallaro then filled out and filed a Workers Compensation report.

On August 3, 2005, plaintiff was informed by Voelkl that he had filed a disability retirement application for her. Voelkl did so pursuant to Gen. Mun. L. § 207-c(2), which provides that if a police officer is permanently disabled because of a job-related injury, the head of the police force may apply for disability retirement on the officer's behalf.[4] Plaintiff testifed at her deposition that prior to August 3, 2005, one or more of her physicians had expressed the opinion that plaintiff's injury was permanent. Tr. at 265.

---

[4]Section 207-c(2) provides:

Payment of the full amount of regular salary or wages, as provided by subdivision one of this section, shall be discontinued with respect to any policeman who is permanently disabled as a result of an injury or sickness incurred or resulting from the performance of his duties if such policeman is granted an accidental disability retirement allowance pursuant to section three hundred sixty-three of the retirement and social security law, a retirement for disability incurred in performance of duty allowance pursuant to section three hundred sixty-three-c of the retirement and social security law or similar accidental disability pension provided by the pension fund of which he is a member. If application for such retirement allowance or pension is not made by such policeman, application therefor may be made by the head of the police force or as otherwise provided by the chief executive officer or local legislative body of the municipality by which such policeman is employed.

Plaintiff does not appear to deny that Voelkl was authorized under New York law to submit that application. *See* Tr. at 273. She takes issue, however, with the wording of the application, the manner in which it was filed, and with the type of benefits she was awarded.

Under the New York statutory scheme applicable to plaintiff, there are two types of disability retirement benefits: "accidental" and "performance of duty" disability retirement benefits. For purposes of this Decision and Order, it is not necessary to set forth that scheme in detail, but in general, accidental disability retirement benefits are higher than performance-of-duty benefits.[5]

Voelkl filed applications for both types of benefits on plaintiff's behalf. *See* Plaintiff's Ex. M (Dkt. #37-8 at 39, 40). Attached to those applications was a statement that read, "On July 9, 2002, I fell while making an arrest. As a result, I suffered an injury to my left shoulder including a torn rotator cuff," and, "On October 13, 2004, while receiving a shotgun which was brought to the Station for destruction, I suffered a re-injury of my shoulder when lifting the weapon." Dkt. #37-8 at 42.

On February 6, 2006, an official with the New York State retirement system found that plaintiff had been injured in the performance of her duties, and that the incidents that caused plaintiff's injuries did not constitute "accidents" for purposes of the Retirement and Social Security Law. The official therefore granted the application for performance-of-duty benefits, and denied the application for accidental disability retirement benefits. Plaintiff's Ex. N (Dkt. #37-8).

Following that decision, the attorney for the Town filed an administrative appeal on plaintiff's behalf, seeking a ruling that plaintiff's disability was due to an accidental injury.

---

[5]Accidental disability retirement benefits are calculated using a formula that includes 75% of the retiree's final average salary, as opposed to 50% for performance-of-duty benefits. *See* N.Y. Ret. & Soc. Sec. L. §§ 363(e)(3), 363-c(f). Plaintiff also testified that she understood that there was a 25% difference between the two types of benefits. Def. Ex. C at 273.

Apparently that proceeding remains pending.[6]  Pursuant to that decision, plaintiff did retire early in 2006.

Although the decision whether to grant plaintiff accidental or performance-of-duty benefits thus was not made by the Town, but by the state retirement system, and despite the Town's filing of an appeal on plaintiff's behalf, plaintiff appears to contend that the submission of the retirement benefits application was retaliatory, because she was not given a chance to review the application beforehand.  Had she been given that opportunity, plaintiff says, she would not have written that she "fell while making an arrest."  She stated at her deposition that her injury occurred "during the pushing and pulling when [she] first walked up to [the citizen] and he gave [her] a shove."  Tr. at 280.  Plaintiff opined that she "could have been any person walking in front of that building and this mentally unstable man could have assaulted" her, which, in plaintiff's view, rendered her injury "accidental."  *Id.*

## DISCUSSION

### I. Retaliation Claims under Title VII and the HRL

### A. General Principles

Claims for retaliation under Title VII and the HRL "are analyzed using the same basic framework."  *Foster v. Humane Society of Rochester and Monroe County, Inc.*, ___ F.Supp.2d ___, 2010 WL 2867325, at *4 (W.D.N.Y. 2010).  *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) ("Claims for retaliation [under the ADA, Rehabilitation Act, and HRL] are analyzed

---

[6]At her deposition, plaintiff testified that the administrative law judge hearing the appeal "reserved judgment until this was over."  Tr. at 153.

under the same burden-shifting framework established for Title VII cases").  While the Court's discussion will mainly be limited to Title VII, then, my analysis applies to both these claims.

To prevail on a Title VII retaliation claim, plaintiff bears the initial burden of establishing a prima facie case of retaliation.  She does so by showing "(1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action." *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).  If the plaintiff does so, the burden shifts to the employer to articulate "some legitimate, nondiscriminatory reason" for its action. *Id.* at 106.  Once the employer provides such a reason, "the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of [retaliation]." *Id.*; *accord Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).

Thus, if the plaintiff makes out a prima facie case, and the defendant proffers a legitimate, lawful reason for the challenged employment action, then to defeat a motion for summary judgment, the plaintiff must be able to point to evidence from which a finder of fact could reasonably conclude that the defendant's proffered reasons were merely a pretext for impermissible retaliation. *See Hicks*, 593 F.3d at 164; *O'Neill v. City of Bridgeport Police Dep't*, ___ F.Supp.2d ___, 2010 WL 2220579, at *8 (D.Conn. 2010); *Rumain v. Baruch College of City Univ. of New York*, No. 06 Civ. 8256, 2008 WL 4866019, at *2 (S.D.N.Y. Nov. 6, 2008).

Earlier this year, the Second Circuit addressed the meaning of "adverse employment action" in the context of a Title VII retaliation claim.  In *Hicks*, the court stated that the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), had

"broadened the scope of Title VII's anti-retaliation provision," so that it is no longer necessary that "the alleged retaliatory act bear on the terms or conditions of employment; the proper inquiry now is whether 'the employer's actions [were] harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Hicks*, 593 F.3d at 169 (quoting *White*, 548 U.S. at 57). *See also id.* at 165 ("Title VII's anti-retaliation provision applies broadly to 'employer actions that would have been materially adverse to a reasonable employee'").

The court in *Hicks* also stated that "by requiring a showing of material adversity, *White* preserves the principle that Title VII 'does not set forth a general civility code for the American workplace.'" *Id.* at 165 (quoting *White*, 548 U.S. at 68) (additional internal quote omitted). Thus, the court explained, "'petty slights or minor annoyances that often take place at work and that all employees experience' do not constitute actionable retaliation," because "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* (quoting *White*, 548 U.S. at 67).

At the same time, however, the Court of Appeals made clear that the assessment of whether an action is materially adverse must be made not in the abstract, but in light of all the surrounding circumstances:

> [B]y considering the perspective of a reasonable employee, *White* bespeaks an objective standard. The standard may be objective, but "[c]ontext matters." "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Therefore, "an act that would be immaterial in some situations is material in others." For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." And of course context can diminish as well as enlarge material effect.

*Id.* (quoting *White*, 548 U.S. at 68-69). In addition, the court stated, "in determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Id.* (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006), *cert. denied*, 549 U.S. 1342 (2007)).


**B. Plaintiff's Claims**

Applying those standards here, I conclude that, as to some purported acts of retaliation, plaintiff has failed to point to evidence from which a reasonable factfinder could conclude that plaintiff was subjected to an adverse employment action because of any protected activity on her part. Plaintiff's retaliation claims based on those acts are therefore dismissed. As to other acts of alleged retaliation, however, I conclude that genuine issues of fact exist as to whether defendants took retaliatory action against plaintiff, and I therefore deny defendants' motion for summary judgment as to those aspects of plaintiff's claims.

There is no dispute here that plaintiff did engage in protected activity, insofar as she filed a complaint with the SDHR, alleging sex discrimination. While the first amended complaint (Dkt. #2) also alleges various other complaints by plaintiff over the years about a number of matters, dating back to the 1980s, plaintiff does not appear to contend that those are anything more than background evidence. In any event, those alleged incidents are remote in time from the events giving rise to this case, and they mostly involve different individuals from those who played a role in the events at issue here.

With respect to the adverse-action element, plaintiff's brief in opposition to defendants' motion identifies seven alleged retaliatory actions: (1) Voelkl's directive that she conduct D.A.R.E. training; (2) Voelkl's directive that she attend IDS training; (3) frequent changes in plaintiff's work hours; (4) the denial of sick time following her abortive IDS training; (5) Voelkl's directive, upon plaintiff's return to light-duty work after the IDS episode, that she report directly to him, rather than to her immediate supervisor, Captain Principe; (6) Voelkl's comment to Cavallaro that plaintiff was "alleging" that she had reinjured her shoulder; and (7) plaintiff's "compelled retirement" when Voelkl filled out and submitted the retirement benefits application on her behalf.[7]

To the extent that plaintiff's retaliation claims are based upon the D.A.R.E. assignment, those claims are dismissed. For one thing, plaintiff never actually went to D.A.R.E. It hardly seems reasonable to think that a directive that was never carried out could be considered "harmful to the point that [it] could well [have] dissuade[d] a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 165.

Furthermore, while the Court is mindful that "context matters" in determining whether an employment action is adverse, plaintiff's opposition to teaching D.A.R.E. appears to have been strictly personal. She testified that "everybody in the police department knows I do not support [D.A.R.E.] in any way," that she "was not behind their format," and that "she d[id]n't want to teach" because she did not consider teaching "a part of being a police officer." Tr. at 207-08.

---

[7]When asked at her deposition to identify the acts that she was alleging were retaliatory, however, plaintiff mentioned only four: the D.A.R.E assignment, the IDS training, the changes to her work schedule, and the denial of sick leave. Tr. at 207-09. Plaintiff did begin to add, "There was others, but I'm–," but she never finished that sentence. Tr. at 209.

As for the IDS training, however, I find that genuine issues of material fact exist. First, while defendants contend that the record shows that defendants were not yet aware, at the time that Voelkl informed plaintiff about the D.A.R.E. assignment, that she had filed a complaint with the SDHR, the evidence indicates that Voelkl was aware of the complaint by September 10, 2004, when he directed her to attend IDS.[8]

Plaintiff did testify at her deposition that IDS training is "sought after" by some officers because they see it as a career-advancing move. She stated, however, that she viewed the IDS assignment as retaliatory, because Voelkl "knew [she] didn't want to go because [she] asked him not to send [her] to training because [she] knew [she] couldn't handle it right then." Tr. at 229.

Although the test for what constitutes an adverse action remains an objective one, the Court must bear in mind the observation by the Supreme Court and the Second Circuit that "[c]ontext matters," and examine the "constellation of surrounding circumstances, expectations, and

_____

[8]Plaintiff alleges that her conversation with Voelkl during which he told her about the D.A.R.E. assignment took place on August 20, 2004, the same day that her SDHR complaint was sworn to by plaintiff. Amended Complaint ¶ 47; Tr. at 210; Def. Ex. D (Dkt. #28-5) at 2. The Plaintiff's SDHR complaint indicates that it was received by the SDHR on August 25, 2004. Def. Ex. D (Dkt. #28-5) at 2.

Although Voelkl did not state at his deposition exactly when he first learned about plaintiff's SDHR complaint, plaintiff testified that she mailed her complaint to the SDHR, which then sent a copy of the complaint to the Town. *See* Tr. at 218-20. She also testified, however, that when she spoke over the telephone to someone at the SDHR prior to filing her complaint, she asked, "Is there a chance that you'll notify them [*i.e.*, the Town of Brighton] prior to them receiving this [*i.e.*, her complaint]?" and that "they said, 'That could happen.'" Tr. at 221.

Because I have found as a matter of law that the D.A.R.E. assignment was not an adverse action, I need not decide whether issues of fact exist concerning whether Voelkl was aware of plaintiff's SDHR complaint at the time that he gave her that assignment. Defendants do not appear to dispute, however, that Voelkl was aware of that complaint by September 10, when he assigned plaintiff to IDS.

relationships" affecting the degree to which an assignment or other workplace act might reasonably be considered adverse by the affected employee. Here, plaintiff's testimony indicates that she had, by the time of the IDS appointment, made it clear to Voelkl that because of the stress that she was then under, she did not believe that she would be able psychologically to handle any training assignments at that time. She testified that when she had spoken to Voelkl about D.A.R.E., they had talked about "training in general," and she told him that she "didn't think [she] could handle it right then." Tr. at 230. Plaintiff also testified that when Voelkl assigned her to D.A.R.E., she commented that "that's one of the most difficult trainings that there are," and that when she asked him, "What is it that you want me to teach?," Voelkl responded, "Whatever I tell you to." Tr. at 232. Plaintiff alleges that she again told Voelkl that she was not "equipped to do this right now," that she was "under a lot of stress," and that she "ha[d] some doctor's appointments coming up," but he responded, in sum and substance, that "it was just the way it was going to be." Tr. at 232-33.

In support of their motion, defendants note that plaintiff also testified that Voelkl said nothing on that occasion about plaintiff's recently filed SDHR complaint, and that when asked at her deposition whether it was possible that Voelkl believed that the IDS assignment might be beneficial to her, plaintiff conceded that she "d[id]n't know what was in his mind ... ." Tr. at 236. That Voelkl did not expressly state that the assignment was intended as payback for plaintiff's SDHR complaint is hardly very probative, however. As the Second Circuit has noted, "employers are rarely so cooperative" as to state that they have taken some action toward an employee for unlawful reasons. *Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008) (quoting *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464-65 (2d Cir. 1989)).

Likewise, that some, even most, officers may have viewed IDS as a desirable assignment is not the test. Again, while the standard is an objective one, the test is not whether, in the abstract, or in general, most officers would have liked to be assigned to IDS. Voelkl's directive that plaintiff attend IDS must be viewed in light of all the circumstances surrounding that assignment. Crediting plaintiff's testimony, as I must in deciding defendants' motion, Voelkl knew, at the time that he ordered her to go to IDS, that she had been under considerable stress, that she had medical appointments coming up, and that she had expressed her belief that she was mentally, emotionally, or psychologically unfit to undergo IDS training at that time.

That is not to say that a job assignment can become retaliatory, for Title VII purposes, simply because the employee voices an objection to it. To so hold would effectively transform the standard into a subjective one. An objectively beneficial assignment does not become adverse merely because the employee has stated that she prefers not to go.

In contrast to the D.A.R.E. assignment, however, plaintiff here did more than just express her general antipathy toward IDS. She gave Voelkl specific reasons why, at that time, it would have been particularly difficult for her to attend, and successfully complete, IDS training. Those reasons concerned her then-existing psychological condition, exacerbated by her continued physical injury and upcoming medical appointments. Voelkl's response, according to plaintiff, was essentially, "too bad," as he brushed aside her pleas and ordered her to go to IDS.[9]

---

[9]It is not apparent from the record before me how long the IDS assignment would have lasted, though presumably it was temporary. While the temporary nature of an assignment generally tends to indicate that it is not objectively adverse, it is not dispositive, and it would be impermissible for the Court to draw such an inference on defendants' motion for summary judgment. *See*, *e.g.*, *Bouvier v. Northrup Grumman Ship Systems, Inc.*, 350 Fed.Appx. 917, 922

(continued...)

Viewing this evidence in the light most favorable to plaintiff, I conclude that if a jury were to credit plaintiff's testimony, the jury could reasonably find that the IDS assignment constituted a sufficiently adverse act that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 165 (internal quotation omitted); *Kessler v. Westchester County Dep't of Social Services*, 461 F.3d 199, 209 (2d Cir. 2006). "Whether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination," *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006), and I conclude that on the facts of this case, that determination should be made by a jury. *See Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004) (whether maintenance of disciplinary charges against plaintiffs constituted an adverse employment action involved a material issue of fact that should have been reserved for a jury); *Sanders v. New York City Human Resources Admin.*, 361 F.3d 749, 756 (2d Cir. 2004) (whether supervisor took adverse employment action against female employee by holding male-only meetings was for jury in plaintiff's Title VII action).[10]

---

[9](...continued)
(5th Cir. 2009) (shipyard employee's two-day suspension and temporary reassignment to crane rigger position with opportunity for reinstatement as crane operator was "adverse employment action" that would support her Title VII claim); *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (five-month assignment of plaintiff to position for which he had no background and the concomitant deprivation of meaningful duties constituted an adverse employment action within the meaning of Title VII); *O'Neill v. City of Bridgeport Police Dep't*, No. 08CV1421, 2010 WL 2220579 (D.Conn.2010) (denying summary judgment as to whether, *inter alia*, temporary assignment to night shift constituted alleged materially adverse action).

[10]Although the issue of whether this assignment was adverse should be looked at principally from the perspective of the time at which the assignment was made, the fact that when plaintiff went to IDS, she lasted less than one day and was unable to complete the training, due to what she described as her "meltdown," Tr. at 257, also suggests (if one assumes the truth of plaintiff's testimony in that regard) that the concerns she had expressed to Voelkl about her

(continued...)

I also find that plaintiff has presented sufficient evidence to give rise to an issue of fact concerning whether the IDS assignment was causally related to her protected activity. First, while Voelkl did not testify as to the exact date on which he learned of plaintiff's SDHR complaint, it seems likely that he knew about it by the time he assigned her to IDS. Voelkl testified that he became aware of the complaint when he "received the notice," Voelkl Tr. at 101, which was presumably a relatively short time after the SDHR received plaintiff's complaint on August 25, 2004. Voelkl testified that he was "[d]isappointed" when he found out about the complaint, because he "thought there was no basis for it," and that "[i]t was certainly not something that [he] greeted happily." Voelkl Tr. at 103-04.

That Voelkl informed plaintiff of the IDS assignment on September 10, 2004, about two and a half weeks after her complaint was received by the SDHR, adds further weight to plaintiff's allegation of retaliatory intent. *See Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010) ("Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action") (citing *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001)). *See, e.g., Cioffi v. Averill Park Central School Dist. Board of Ed.*, 444 F.3d 158, 168 (2d Cir. 2006) (lapse of a little over three months after employee's first act of protected speech and three weeks after second such act and adverse employment action was sufficient to support an allegation of causal connection strong enough to survive summary judgment); *Reddy v. Salvation Army*, 591 F.Supp.2d 406, 429 (S.D.N.Y. 2008) ("short interval" of three weeks between employee's

---

[10](...continued)
fragile emotional state were not fanciful.

lodging of complaint of discrimination and her subsequent termination was sufficient to establish a causal connection between the two).

That, of course, is not the only inference that might reasonably be drawn from the evidence. It is also possible that, as Voelkl testified at his deposition, he directed plaintiff to attend IDS "[i]n an effort to find meaningful light duty assignments that would benefit both the department and Sergeant Lundy." Def. Ex. E (Dkt. #28-6) at 105. The fact that Voelkl had recently attempted to send plaintiff to D.A.R.E. lends some credence to that assertion; since that fell through, it is possible that Voelkl was simply attempting to find some other assignment for plaintiff that would be more productive, useful, or suitable than simply record-keeping.

Again, though, that is not for the Court to decide at this juncture, nor is it necessary for plaintiff, at this point, to disprove defendants' stated reasons for acting as they did. To defeat defendants' motion for summary judgment, it is only necessary for plaintiff to present enough evidence from which a rational finder of fact *could* conclude that those stated reasons are a pretext for unlawful retaliation. Drawing all reasonable inferences in plaintiff's favor, I find that she has done so. *See Noyes v. Kelly Services*, 488 F.3d 1163, 1170-71 (9th Cir. 2007) (at summary judgment stage, plaintiff need not *prove* that an employer's articulated reasons were pretextual, such that a court could direct a finding in the plaintiff's favor, but need only raise a triable issue of fact regarding pretext); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (to defeat summary judgment, plaintiff "need only point to evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence. ... A plaintiff is not required to produce evidence which necessarily leads to the conclusion that the employer did not act for the

nondiscriminatory reasons") (internal quotation marks and citations omitted), *cert. denied*, 515 U.S. 1159 (1995); *Sherden v. Cellular Advantage, Inc.*, No. 07-CV-1006, 2009 WL 1607598, at *10 (N.D.Ill. June 9, 2009) ("a plaintiff at the summary judgment phase need only present evidence that the employer's nondiscriminatory explanation is not credible. A plaintiff is not required, at this phase of the litigation, to show that any pretext was a mask for discrimination") (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)).

With respect to plaintiff's remaining alleged adverse actions, which generally followed her abortive attendance at IDS, many, if not all of them might not reasonably be viewed as adverse actions, at least when viewed individually. As noted, however, the Second Circuit has stated that "in determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks*, 593 F.3d at 165. Thus, evidence that Voelkl began frequently changing plaintiff's work schedule, with little advance notice to her may be considered as some evidence that plaintiff was subjected to an adverse action following her SDHR complaint. Though a simple change in work schedule will not ordinarily rise to the level of a materially adverse action, when viewed in the context of the difficulties that plaintiff was experiencing at the time and the other surrounding circumstances, the schedule changes could reasonably be found to constitute adverse actions. *See White*, 548 U.S. at 69 (noting that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children"). *See*, *e.g.*, *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 659 (7th Cir. 2005) (concluding that unwanted alteration of

employee's work schedule following complaint of discrimination was adverse employment action for purposes of retaliation claim); *Maldonado v. Cooperativa De Ahorro*, 685 F.Supp.2d 264, 276 (D.P.R. 2010) (stating that "the conditions of Plaintiff's employ materially changed" when, *inter alia*, "his supervisor changed his work schedule"); *see also Hicks*, 593 F.3d at 170 (district court erred in concluding that plaintiffs' claim of "punitive scheduling" could not show adverse employment action).

I also conclude that Voelkl's instruction to plaintiff, when she returned to work after the IDS episode, that she report directly to him, rather than to her immediate supervisor, Captain Principe (who had allowed plaintiff to go home when she became upset on her first day at IDS), and Voelkl's comment to Cavallaro that plaintiff was "alleging" that she had reinjured her shoulder; while not adverse actions in themselves, may be considered as part of the "aggregate" of events giving rise to plaintiff's claim of retaliation.

As to the order that plaintiff report directly to Voelkl, he testified that he told plaintiff that "there were too many people involved in making decisions what her schedule would be, etc.," and he therefore instructed her, "Deal directly with me if you need to go to a doctor's appointments [sic] rather than go through a lot of different people." Voelkl Tr. at 115-16. Voelkl further testified that plaintiff was the only officer in the department whom he required to report directly to him rather than through the chain of command. *Id.* at 116. That action, like Voelkl's comment about plaintiff "alleging" that she had hurt her shoulder, might suggest to a factfinder–and might have suggested to a reasonable employee in plaintiff's position–that Voelkl was implying that she was faking, or at least exaggerating, her injury, and that he wanted to keep a tighter rein on her ability to take time off

for medical or other reasons.  While there are certainly other, more benign explanations for these statements by Voelkl, I believe that a jury could consider them as evidence that Voelkl's attitude toward plaintiff changed around the time that she filed her SDHR complaint, which might in turn tend to show that his insistence that she go to IDS, and his frequent changes to her work schedule, were motivated in part by retaliation.

I further conclude that the denial of sick time immediately after plaintiff's brief attendance at IDS, and her alleged "compelled retirement," are not adverse actions, whether viewed singly or collectively, though evidence about these matters may be admissible at trial as part of the overall narrative of events.  The sick time matter concerned no more than two or three days, and plaintiff testified that although Voelkl initially refused to allow her to take any sick time, he later changed his mind, and that she was allowed to take sick time for her medical appointments.

As to her retirement, plaintiff does not appear to allege, nor is there any evidence, that defendants' submission of her retirement papers was in itself wrongful.  Plaintiff takes issue only with the fact that she was not given a chance to review the paperwork in advance.  As explained above, however, defendants submitted dual applications on plaintiff's behalf, and the Town appealed on plaintiff's behalf from the state retirement official's decision to grant performance-of-duty rather than accidental benefits.  There is no evidence to suggest that defendants deliberately misstated the facts concerning the cause of plaintiff's injury, that they acted in bad faith, or that the state retirement system would have reached a different result had plaintiff been given a chance to review the application before its submission.

**II. ADA Claim**

Plaintiff alleges in her complaint that plaintiff had "a disability known to the defendant, i.e. loss of the use of her left arm," that the Town "failed to accommodate her known disabilities," and that as a result plaintiff "was compelled to resign at a reduced rate to that which she was entitled to as an officer injured in the line of duty by Chief Voelkl on the basis of her disability." Dkt. #2 ¶ 79. Plaintiff alleges that defendants thereby violated the ADA.

A claim of disability discrimination under the ADA is subject to a burden-shifting analysis similar to that applied to other types of discrimination claims. First, plaintiff must establish a prima facie case of discrimination by demonstrating that: (1) her employer is subject to the ADA; (2) plaintiff was a person with a disability within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodations; and (4) plaintiff's employer refused to make a reasonable accommodation for her. *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).

Once the plaintiff has met that burden, and has shown that an accommodation exists that would permit her to perform her job's essential functions, "the analysis shifts to the question whether the proposed accommodation is reasonable; on this question the burden of persuasion lies with the defendant." *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir.), *cert. denied*, 531 U.S. 931 (2000). *See also Sclafani v. PC Richard & Son*, 668 F.Supp.2d 423, 441 (E.D.N.Y. 2009) (once plaintiff has made out prima facie case, burden shifts to employer to "demonstrate that the ... proposed accommodation would have resulted in undue hardship") (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000)).

There is no dispute here that the Town is an employer covered by the ADA. Defendants do dispute whether plaintiff has made a prima facie showing that she is a "person with a disability," however.

"An employee is not disabled under the ADA unless the impairment substantially limits one or more major life activities." *Rogers v. City of New York*, 359 Fed.Appx. 201, 203 (2d Cir. 2009) (citing 42 U.S.C. § 12102(2)(A) & (C), and *Ryan v. Grae & Rybicki. P.C.*, 135 F.3d 867, 869 (2d Cir. 1998)). "Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 195 (2002); *see also Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005) ("Not every impairment is a 'disability' within the meaning of the ADA; rather, there are two requirements: the impairment must limit a major life activity and the limitation must be substantial"). "Major life activities" include, *inter alia*, caring for oneself, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i). Whether an impairment substantially limits a life activity is determined by considering: (1) the nature and severity of the impairment; (2) the duration of the impairment; and (3) the impairment's permanent or long-term impact. 29 C.F.R. § 1630.2(j)(2).

In the case at bar, plaintiff has not succeeded in making out the second element of her prima facie case, *i.e.*, that she is disabled within the meaning of the ADA. While there appears to be no dispute here that her shoulder injury constitutes an impairment, *see Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 911 (7th Cir. 1996) ("Nobody disputes Cochrum's shoulder injury is an impairment"), plaintiff has failed to show that the injury substantially limits any of her major life activities. In fact,

plaintiff's papers seem simply to take it as a given that she is disabled, without even discussing the elements of her prima facie case. It is plaintiff's burden to establish each of those elements, however. *See Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 32 (1st Cir. 2010); *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 183-84 (2d Cir. 2006).

An ADA plaintiff can also prevail by showing that the employer perceived or regarded her as disabled. "A 'regarded as' claim 'turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability.'" *Capobianco*, 422 F.3d at 57 (2d Cir. 2005) (quoting *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998)) (additional internal quotation marks omitted). In addition, "[i]t is not enough that the employer perceive the employee as 'somehow disabled'; the employer must regard the employee as 'disabled within the meaning of the ADA,' *i.e.*, having an impairment that substantially limits a major life activity." *Id.* (quoting *Colwell*, 158 F.3d at 646).

Although plaintiff's papers do not appear to address these matters, at oral argument plaintiff's counsel appeared to take the position that defendants' filing of a disability retirement application on plaintiff's behalf either estops them from asserting that plaintiff is not disabled, or that it amounts to an implicit admission either that she is disabled, or that they regard her as disabled. I disagree.

An analysis of this issue requires some familiarity with New York's Retirement and Social Security Law §§ 363 and 363-c, which "are each part of a statutory statewide program for the retirement of police officers and firefighters." *McCaffrey v. Town of East Fishkill*, 42 A.D.3d 22, 25 (2d Dep't 2007). Section 363 entitles a "member," which includes police officers, *see* Ret. & Soc. Sec. L. §§ 302(16), 340, to an accidental disability retirement allowance if the member becomes

"[p]hysically or mentally incapacitated for performance of duty as the natural and proximate result of an accident not caused by his own willful negligence sustained in such service." Ret. & Soc. Sec. L. § 363(a)(1). Benefits pursuant to § 363-c, on the other hand, are available to a police officer or firefighter who "becomes physically or mentally incapacitated for the performance of duty" in the line of duty. *See* Ret. & Soc. Sec. L. § 363-c(a).

One of the "essential attributes" of these provisions is that "benefits are available when the firefighter or police officer can no longer perform the duties required of his or her position, *even if he or she is not disabled from performing other work*." *McCaffrey*, 42 A.D.2d at 25 (emphasis added). Indeed, the statutes' references to the employee being "incapacitated for the performance of duty," rather than "disabled," suggests that the focus under those statutes is on whether the employee is able to perform the duties of her position as a police officer or firefighter, rather than on whether she is able to work generally.

In the case at bar, the application submitted by defendants on plaintiff's behalf stated that her shoulder injury was causing "such pain that [she] could no longer perform the duties of a Police Sergeant," and that she had also "developed a psychological disability which cause[d her] to be disabled from the performance of [her] duties." Dkt. #37-8 at 41. In granting the application for benefits, the state retirement system official likewise found that plaintiff was "permanently incapacitated for the performance of duties." Dkt. #37-8 at 44. The official did *not* find, then, that plaintiff was "disabled" as that term is used in the ADA.

Thus, defendants' submission of the retirement application is not inconsistent with their present assertion that plaintiff is not disabled for purposes of the ADA, and there is no other

evidence either that plaintiff was disabled, or that defendants regarded her as disabled within the meaning of the ADA. As stated, it is not enough, under the ADA, that the employer believed that the plaintiff was unable to perform the duties of her position; "the employer must regard the employee as disabled within the meaning of the ADA, *i.e.*, having an impairment that substantially limits a major life activity." *Capobianco*, 422 F.3d at 57 (internal quotation marks omitted). *Accord Shannon v. New York City Transit Auth.*, 332 F.3d 95, 99 n.1 (2d Cir. 2003); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998); *Caruso v. Camilleri*, No. 04-CV-167, 2008 WL 170321, at *18 (W.D.N.Y. Jan. 15, 2008).

Nothing in the record suggests that defendants perceived plaintiff as having an impairment that substantially limited any major life activity. The fact that plaintiff had been working for some time in a light-duty assignment indicates precisely the opposite: that defendants knew or believed that plaintiff was capable of working in some capacity. The evidence suggests only that defendants were not willing to allow her to remain in a light-duty position indefinitely, and that if she could not return to ordinary, full-duty police work, they would prefer that she retire, to free up a spot for a new police officer. Pamela O'Brien, who was the Town's personnel director at the time of the events giving rise to this lawsuit, testified at her deposition that when plaintiff was on light duty, that meant that there was "one less police officer out on the road," and that as long as she remained on light duty, the Town could not hire another officer for patrol duty, because "the police department has budgeted and authorized a certain number of uniformed police officers that can do patrol work." O'Brien Tr. (Dkt. #28-9) at 31.

Plaintiff has not contradicted that testimony. Although she takes issue with defendants' assertion that they could not have kept her on continued light duty, there is no evidence suggesting that defendants believed that plaintiff was not adequately performing the duties of her job in the records department. In short, there is no evidence that defendants' filing of her retirement application was prompted by any belief or perception on their part that plaintiff had an impairment that substantially limited her ability to work, or to engage in any other major life activity. *See Giordano v. City of New York*, 274 F.3d 740, 749 (2d Cir. 2001) (although defendants conceded that they believed that plaintiff's health problems rendered him incapable of performing the duties of a full-duty police officer, court found "no evidence in the record that suggests that the defendants perceived Giordano as unable to work in a 'broad class of jobs,'" and district court therefore properly granted summary judgment for defendants); *Caruso*, 2008 WL 170321, at *20-*21 (finding that "Defendants only believed Plaintiff was unable to perform the complete range of duties of a police officer," and that "[d]efendants' mere failure to offer 'light duty' to Plaintiff does not constitute evidence that Defendants regarded Plaintiff as disabled sufficient to avoid summary judgment").

I conclude, then, that there is no evidentiary basis here for a finding that plaintiff was disabled, or that defendants regarded her as disabled, within the meaning of the ADA.[11] Accordingly, plaintiff has failed to make out a prima facie case of disability discrimination under the ADA, and her ADA claim must therefore be dismissed.

---

[11]The Court's finding in this regard renders it unnecessary for me to address defendants' argument that plaintiff has not shown that she was otherwise qualified to perform the essential functions of her job as a police officer, with or without reasonable accommodation.

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #28) is granted in part and denied in part. Defendants' motion is granted as to plaintiff's first cause of action, alleging unlawful retaliation based on plaintiff's exercise of her rights under the First Amendment; her second cause of action, alleging unlawful discrimination on the basis of plaintiff's sex; and her seventh cause of action, alleging a claim under the Americans with Disabilities Act. Those three claims are dismissed.

Defendants' motion is also granted as to plaintiff's third cause of action, alleging unlawful retaliation under Title VII, and her fourth cause of action, alleging unlawful retaliation in violation of the New York State Human Rights Law, insofar as those claims are based on defendant Voelkl's directive that plaintiff attend D.A.R.E. training, the denial of sick time following plaintiff's attendance at IDS, and her alleged "compelled retirement." The extent to which evidence concerning those events may be presented at trial will be determined either closer to, or at, the trial in this case. In all other respects, defendants' motion is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      August 18, 2010.